LOTTINGER, Judge.
This is an action to rescind the sale of a certain pickup truck. The petition alleges that on September 15, 1953 the plaintiff, Clyde J. Castille, made arrangements with defendant, Champ Auto Sales, Inc., to purchase a Studebaker one-half ton truck which was represented to him to be a 1952 model and that the purchase price therefor was to be the sum of $1,160. It is further alleged that on September 16, 1953, the plaintiff paid to the defendant the agreed upon price of $1,160 and the truck was delivered to him. It is averred that at that time the defendant did not have the certificate of title but promised to deliver same within a few days.
Subsequently, the plaintiff is alleged to have been furnished with a title certificate which was delivered to him purportedly covering the subj ect truck, but covering not a Studebaker truck but a Chevrolet truck and recited that the vendor was not the defendant but one Richard Matt. The fur *132 ther allegation is made that upon receiving this certificate, the plaintiff went to defendant’s place of business in Lafayette and asked them to correct the matter but that no steps were taken to deliver to him a good and merchantable title. It is further averred that at the time the truck had no license plates and could not be operated lawfully upon the highways of the State. Subsequently, the plaintiff is alleged to have applied to the Collector of Revenue of the State of Louisiana for the necessary certificate of title and license plates, but because of the discrepancy in the certificate which he had been issued, he could not get a valid certificate of title. The further allegation is made that the plaintiff subsequently learned that the Studebalcer which had been delivered to him was not a 1952 model as it had been stated to be, but was in fact a 1951 model.
The further allegation is made that defendant knew of the discrepancy in the models and that such misrepresentation on its part constituted fraud and that the petitioner is therefore entitled to have the sale declared null and void. In addition to seeking the nullity of the sale, the petition prays for the sum of $1,000 as damages for mental anguish resulting from the fraudulent misrepresentations of the defendant, the sum of $640 as loss of income resulting from non use of the vehicle at $15 per day, $500 for attorney fees and $500 for future loss of income.
The defendant first filed an exception of vagueness and then filed an answer. The answer admitted that negotiations were made on September 15, 1953, with a view toward the plaintiff purchasing a truck, but it was specifically denied that the truck was represented as being a 1952 model. It it admitted that a certificate of title was promised to be delivered but the answer avers that the only certificate which was promised was the certificate which the defendant had and which it promised to deliver only in its then existing form. The further allegation is made that the defendant did not own the truck but merely sold same with the knowledge and consent of its owner, Richard Matt, acting merely as an agent and for his benefit. It is specifically averred that the truck was sold not as a 1952 model but merely as a model “2R5 Studebalcer one-half ton pick-up truck” which the plaintiff carefully examined and inspected before purchasing it. It is further set forth that the error on the certificate of title was harmless and that same could be easily corrected; and that, in fact, the defendant had repeatedly offered to have same corrected, but the plaintiff made no reasonable or bona fide attempt to obtain the corrected certificate and/or license plates. It is also averred that no fraud was intended or perpetrated, that the truck had no hidden defects or real redhibitory vices and that any loss or inconvenience sustained by the plaintiff was the result of his own wilful and arbitrary actions.
Judgment was rendered in the court below in favor of the plaintiff ordering that the sale be rescinded and that the defendant pay to the plaintiff the sum of $1,160 from which judgment the defendant has appealed to this court.
While the petition seeks the sum of $1,160, being the purchase price of the truck, together with the sum of $2,145 as damages and $500 for attorney fees, we nevertheless have jurisdiction as the trial judge only awarded $1,160 and the plaintiff has answered the appeal asking that the judgment be affirmed.
The plaintiff testified as follows:
That he was engaged in the plumbing, heating and contracting business and that on September 15, 1953, he went to the defendant’s place of business to purchase a truck which had a carry-all bed on it. With him at the time was a friend named Firman Hebert. At the defendant’s place of business he spoke with a Mr. Deshotel whose first name he did not know but who was the manager at the defendant’s place of business on Carenero highway out of La *133 fayette. According to the plaintiff, Desh-otel told him that the truck was a 1952 Model Studebaker. The agreed upon price was $1,160, payable cash, and this price was based on its being a 1952 model truck. The next morning he returned to the defendant’s place of business and gave them his check for $1,160. At that time the truck had license plates but they were marked “dealer” plates, and' shortly after he had taken the truck home, one of defendant’s employees came and removed the license plates. Deshotel told the plaintiff that he would have to get his own license plates and that he had 10 days within which to do so. He stated that he went to defendant’s place of business about every two days trying to get a title and that what he wound up with was a title calling for a Chevrolet truck instead of a Studebaker truck. He identified the title tendered him as P-2 which was attached to his petition. On the reverse of the title the seller was set forth to be one Richard Matt, a person unknown to the plaintiff. Mr. Deshotel did not tell him that the truck belonged to Matt and the only thing that he said along those lines was that he would give him a correct title in about two days. He stated that he attempted to get license plates but was refused by the department of Revenue of the State of Louisiana. At the time of the purchase, the plaintiff owned two trucks in connection with his business, one of which was getting old and which he was going to replace with the new Studebaker. Pie received the title certificate about 10 days after he bought the truck, he testified on cross-examination. He said he felt that he had been cheated when he found out about the discrepancy in the model and that he did not ask Mr. Glasscot, the president of the defendant corporation, to help him get a license. His only effort to get the license tags appeared to have been the one time he visited the bureau and they told him that he could not get the license at that time. He did not ask either Mr. Glasscot or Mr. Deshotel to help him get a license, and repeated he only went to the bureau once in order to get a license there. He first saw the Studebaker truck about a month before he attempted to purchase.it. At that time it was located at the Acme Garage, but he had first seen it at the defendant’s place of business. At that time a refrigeration sign had been on the truck and had been sanded off. The truck was equipped with what is known as a Morrison Carry-All, which is a utility body designed especially for electricians and plumbers and those in related work. He stated further that after he bought the truck he put a bumper guard on it but he did not deface the body in any way. At that time he stated that it could stand a little touch up paint job to hide the “refrigeration” lettering which was still there when he acquired it. In his talks with Mr. Glasscot the question of the paint job did not come up. When he talked to Mr. Deshotel about purchasing the truck on the 15th, he went in alone and there were about five men around at the time. One of these was Mr. Hebert, previously referred to. He was shown a new truck also and it was pointed out to him that there was no change between a 1952 and a 1953 model, according to Mr. Deshotel, who said that the only difference was the serial number. He stated that he was strictly going by the year and when asked if he was told whether it was an R5 model or not, replied that he did not know whether that was stated to him or not. He tried the truck out before he bought it and thought that it was in good shape. The carry-all bodies, he stated, sold new for about $400. The mileage at the time was about a little over 12,000.
On redirect examination, he stated that he agreed to buy a 1952 Studebaker for the stated price and that he would not have been willing to pay that price for a- 1951 Studebaker.
Firman Hebert called at the instance of the plaintiff testified as follows:
He knows both Mr. Castille and Mr. Deshotel, the defendant’s salesman. He *134 was present at the conversation between these two men relative to the purchase of a truck which occurred about the middle of September, 1953, in the afternoon. Mr. Castille at that time asked for a 1952 Studebaker to which Mr. Deshotel replied that they had one with a like new guarantee. It was a panel truck and, as well as he could remember, was bluish-black in col- or. He did not remember the price that was discussed but stated that he remembered Mr. Deshotel telling Mr. Castille the truck was a 1952 Studebaker.
On cross-examination the attorney for the defendant established that this witness understood English but not well enough to answer in English and thereupon his testimony was taken through an interpreter. The conversation between Deshotel and Castille was all in French, he stated.
The defendant’s counsel called to the stand, Eldridge Melancon, who testified as follows:
That he was employed in Lafayette by the Department of Revenue, Motor Vehicle Division, the department that issues licenses for all automobiles, pickup trucks, etc. This witness identified a form used by his department entitled “Application for Corrected Certificate of Title” being form VEH-9, Department of Revenue, Motor Vehicle Division, Baton Rouge, Louisiana. He stated that those forms were used during the month of September, 1953 and stated that this form was used in order to purchase license plates when the body style or year or serial number or one of those things is in error. This witness testified that upon the correct filling out of the form VEH-9 properly signed. by the previous owner, that there was no reason why a license plate could not be obtained. He identified another form in use by his department whereby the State Police make an inspection of the vehicle, motor number and serial number, etc., and that, while the State Police do not necessarily fill out the corrected certificate of title form, they can do so, though this is not a practice of the department, it is a possible means of getting a corrected certificate of title. The witness also identified another form marked VEH-20 captioned “Department of Revenue, Motor Vehicle Division, Baton Rouge, Louisiana, Affidavit of Physical Inspection.” These, he stated, could be filled out not only by State Police but also by men connected with the Motor Vehicle Bureau who do nothing else but make these actual physical inspections.
On cross-examination the witness was shown the certificate of title marked P-2 and asked if in order to get a corrected certificate of title the signature of Mr. Richard Matt would have to be secured and he stated that it would.
Mervin Nacise testified as follows:
He was working for the defendant during the month of September, 1953 and remembered the day when Mr. Castille bought the Studebaker from Mr. Deshotel. He had seen the plaintiff examining the truck previously when it had been in the garage at St. Antoine Street, (Acme apparently) at which time the plaintiff had asked him if the truck was for sale and he stated that he “guessed so.” He also told him that it belonged to Champ Motors to which the plaintiff replied that he might come and see the truck. He came the same day at which time he and two of the mechanics were in the shop. He went to talk to Mr. Deshotel who was in the office by himself. The party then came out and looked at the truck at which time he did not see anybody else standing near them. Mr. Castille tried out the truck for about a half hour. The next day he returned and drove off in the Studebaker.
Mr. Giles Deshotel testified as follows:
He discussed the sale of the Studebaker half ton truck with the plaintiff and sold the same to him on September 16th. He was acquainted with Mr. Firmen Hebert who waits at his place at the garage every day for his sister. On the day that he talked to Mr. Castille about the truck he *135 did not see him there. The discussion had with respect to the automobile was not in French but in English and no one was present but himself and Mr. Castille. With respect to the model, he stated that he told the plaintiff that it was either a 1951 or a 1952 model and by that he meant that they had not changed the model, or in other words, that the 1951 and 1952 models were the same. At no time after that before the sale or at the time of the sale did they discuss the year model of the truck. Two or three days after the sale the plaintiff called to see about his title and Deshotel told him that he would have to get it out of Opel-ousas and the plaintiff seemed satisfied. When the plaintiff consulted him with respect to the title, the witness stated that it could be remedied and that he had not noticed the error on the certificate. After that he stated that he did not consult with the plaintiff at any time with respect to the certificate of title. He put in a call to Mr. Glasscot for the plaintiff to speak to but did not hear the conversation. He stated that the pickup trucks are designed as “R5” and are not designated by year models at all, the model being determined solely by the Serial Number. Further, he said that he could not have told him what model it was as between a 1951 and 1952 unless he had looked up the serial number as the models were “identically the same.” He repeated that he did not tell him that it was a 1952 truck but said merely that it was either a 1951 or a 1952 truck with which the plaintiff seemed to be satisfied.
On cross-examination he repeated that he knew Firman Hebert very well and he waited at the garage for his sister .every day. He repeated, however, that he was not there when the transaction took place on the 15th and, further, that the transaction did not occur at 5 o’clock that afternoon but was earlier. He repeated that he was not present and that only Mr. Castille was there with him when the deal was made. He said that he sold the truck for the defendant, that he did not at any time tell him that the defendant did not own the truck and that he told him that the title would have to be obtained from Opelousas. He admitted that in the resale value of an automobile, a one year difference in the model would make some difference. He did not know at the time he handed the title to Mr. Castille that it was erroneous. The truck was sold with the same guarantee as a new car, that is for 90 days. On recross-examination, the witness stated that he and Mr. Castille had always spoken English although he knew how to speak French.
Seeman Glasscot testified as follows:
He is the president of the Champ Auto Sales, Inc., and was familiar with the title to the Studebaker truck which had been sold to the partnership of “Lalan and Matt,” the certificate of title being made out to one Richard Matt. The partnership was indebted to the corporation and when the truck was sold, it was sold for the benefit of Mr. Lalan and to credit their note then outstanding. This witness stated that they offered to straighten out the title for plaintiff to obtain the license but that they were unable to do anything without first receiving the title that Castille had in his possession and that he tried to make Castille understand that that would be necessary if he wished them to obtain the license for him.
From the above and foregoing it will be seen that the plaintiff’s action is based on the grounds that: (1) The defendant never furnished him with marketable title or, alternatively, (2) the defendant made a material mistatement of fact upon which the plaintiff relied.
From the testimony in the record it is clear that the -obtaining of a corrected certificate of title is a relatively easy matter. While it is true that the signature of one Richard Matt would have had to be obtained on the application, .there is nothing which proves that the defendant refused to procure same. On the contrary, it is *136 our impression from the record as a whole that had the plaintiff been more cooperative in the matter, and not so content to rely upon what he believed to be his rights, the matter of the certificate of title and license plates could very simply have been worked out. Consequently, we do not believe that the sale should be annulled because of the title question.
In support of his alternative contention the plaintiff asserts that the defendant was guilty of fraud in stating that the truck was a 1952 model and that, even if the defendant made the statement in good faith, it related to the principal motive for making the purchase and he is nonetheless .entitled to redhibition under LSA-C.C. art. 2529.
We feel no hesitancy at all in concluding that the record falls far short of containing the proof required to prove fraud. Even if the defendant’s employee did state that the truck was a 1952 model (which is highly questionable in view of the contradictory testimony on the subj ect), it would not, in view of the surrounding facts and circumstances be fraud.
The Supreme Court in the recent case of Sanders v. Sanders, 222 La. 233, 62 So.2d 284, 286, said:
“In the jurisprudence of this court it has been said that the charge of fraud is a most serious one; that one who alleges fraud has the burden of establishing it by legal and convincing evidence since fraud is never presumed, and that to establish fraud exceptionally strong proof must be adduced. [Citing authorities.] It has also been said that evidence showing that the' fraud was probable or that the circumstances partook of a suspicious character is not sufficient, and that the fraud must be established by proof stronger than the mere preponderance of the evidence.” (Citing authorities.)
Also in the case of Buxton v. McKendrick, 223 La. 62, 64 So.2d 844, 846, the Supreme Court said:
“ ‘Two things are necessary to constitute fraud: the intention to defraud, and actual loss or damage, or such strong probability of it as will induce a court to interfere.’ ”
Left for consideration is the question of whether, assuming that the representation was made to the effect that the truck was a 1952 model, the plaintiff is entitled to have the sale rescinded. We think not. Counsel cites the case of Beyer v. Estopinal, 224 La. 516, 70 So.2d 109, for the proposition that a .misrepresentation of the model year of a car is a reason for redhibition even when the vendor is in good faith. A reading of the cited case, however, shows that the truck here was a 1942 model (instead of a 1946 model as stated on the bill of sale) and, in addition, burned excessive oil on its first trip, broke down on its second trip and was found to have undersized parts which impaired its performance. We think that these facts are in contrast with the ones here where there is no evidence to show that the truck was anything but satisfactory in operation and performance. Considering the plaintiff’s business, the events leading up to the sale, the truck itself, together with the type body with which it was equipped, we believe that the year model was inconsequential and that, even if there was a misrepresentation as to the year model, it would not be of sufficient gravity to warrant rescission.
For the reasons assigned, the judgment appealed from is reversed and plaintiff’s suit dismissed at his costs.
Judgment reversed.